1   William D. Hyslop
2   United States Attorney
    Eastern District of Washington
3   David M. Herzog
    Assistant United States Attorney
4   Post Office Box 1494
5   Spokane, WA 99210-1494
    Telephone:  (509) 353-2767
6

7

8               UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF WASHINGTON
9

10

| | |
|---|---|
| 11   UNITED STATES OF AMERICA, | No. 2:17-CR-00209-SMJ-1 |
| 12                   Plaintiff, | United States' Sentencing Memorandum |
| 13 | |
| 14           v. | Sentencing Hearing:<br>September 24, 2019, at 9:30 a.m. |
| 15   JUAN VAZQUEZ-GONZALEZ, | Spokane, Washington |
| 16     aka "Alonso," | |
|       aka "Adominis goering," | Exhibits A, B, C, and D filed |
| 17                   Defendant. | contemporaneously (Under Seal) |
| 18 | |
| 19 | Court: |
| 20 | Hon. Salvador Mendoza, Jr.<br>United States District Judge |

21

22       Plaintiff United States of America, by and through William D. Hyslop, United

23 States Attorney for the Eastern District of Washington, and David M. Herzog, Assistant

24 United States Attorney for the Eastern District of Washington, hereby submits the

25 following Sentencing Memorandum with regard to Defendant Juan Vazquez-Gonzalez

26 ("Defendant").

27

28

1    The United States recommends the following sentence: 120 months in custody, 20
2    years of supervised release, no fine, a mandatory special assessment of $100 and a
3    $5,000 special assessment absent a finding of indigence by the Court.

4    The United States' sentencing position is based upon the attached memorandum
5    of points and authorities; the files and records in this case; Exhibits A, B, C, and D, filed
6    contemporaneously herewith under seal; and such further evidence and argument as the
7    Court may permit.

8    Dated: August 20, 2019

9                                                    William D. Hyslop
                                                     United States Attorney

10

11                                                   *s/ David M. Herzog*
                                                     David M. Herzog
12                                                   Assistant United States Attorney

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.    Introduction**

For almost two months, Defendant Juan Vazquez-Gonzalez ("Defendant") engaged in explicit sexual communications with a person he believed to be a thirteen-year-old girl, and with her purported father, for the stated and clear purpose of engaging in penetrative sexual intercourse with the child.  Twice during that time period, the undercover officer withdrew from communications with Defendant, and both times Defendant re-initiated contact with the undercover officer, in search of sex with the child.  Defendant even volunteered to the undercover officer that he was masturbating to orgasm while fantasizing about "littles."  On October 18, 2017, Defendant made arrangements to meet the girl and her father at a coffee shop in Spokane, with explicit plans to take the girl home to his apartment and engage in sexual intercourse with her in exchange for some of his Playstation games.  Defendant showed up in person at the coffee shop at the arranged time to meet the girl, and he explained to her purported father that while he was having sex with her, he would turn the sound up on his television so his roommates would not hear them.  Defendant specifically repeated the "rules" back to the purported father, including that he would not get the child pregnant, and he would not engage in anal sex with her.

Defendant's entire course of conduct is *undisputed*.  What Defendant *did* when he thought no one else was watching should drive this Court's sentence, not the kind of family he comes from, nor the support he now has from his wife and friends, nor an after-the-fact and plainly self-serving psychosexual evaluation concluding that he has unspecified anxiety and borderline intellectual functioning.  The facts are the facts: when Defendant was chatting for months with a purported thirteen-year-old girl and her father to arrange an in-person meeting for sexual intercourse with her, his stable upbringing and family support did not deter him, his supportive wife and friends did not deter him, and his anxiety and borderline intellectual functioning did not deter him.  He repeatedly and affirmatively sought out sex with a child.  He should be sentenced accordingly.

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 1

## II.    Procedural Posture, the Charges, and the Plea Agreements

Defendant was originally charged with Attempted Online Enticement of a Child for Illegal Sexual Activity, in violation of 18 U.S.C. § 2422(b) (Count 1) and Attempted Child Sex Trafficking, in violation of 18 U.S.C. § 1591 (Count 2).  The United States has maintained its position throughout this case that an appropriate sentence for Defendant is between the 10-year mandatory minimum sentence applicable to the attempted online enticement conduct in which he engaged, and the 15-year mandatory minimum sentence applicable to the attempted child sex trafficking conduct in which he also engaged.  The defense has steadfastly sought the ability to argue for a sentence below these mandatory minima *and* below the Guidelines.

The United States originally offered, and Defendant entered, a plea agreement that comported with both of these sets of interests.  In it, the United States and Defendant originally agreed to a plea agreement in which the United States would move to pierce the applicable 15-year mandatory minimum sentence, and the Court could exercise its discretion to sentence Defendant pursuant to the factors set forth at 18 U.S.C. § 3553(a).  Defendant entered that agreement and pleaded guilty to Attempted Child Sex Trafficking in a plea agreement governed by Federal Rule of Criminal Procedure 11(c)(1)(C).  (ECF No. 57.)

After the entry of the Rule 11 plea, the Court permitted Defendant to withdraw his plea out of concerns raised by the United States Probation Office that even if the Court granting the United States' motion to pierce the mandatory minimum, the Court would still be legally required to sentence Defendant to the mandatory minimum 15 years, less only the value of the substantial assistance, pursuant to *United States v. Jackson*, 577 F.3d 1032, 1036 (9th Cir. 2009).

Thereafter, the United States and Defendant worked diligently to come up with a new plea agreement that was factually accurate, met the elements of a statute without a mandatory minimum, and would still result in a Guidelines range between 10 and 15 years.  The result of those negotiations was the operative plea agreement, in which

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 2

1  Defendant has pleaded guilty to Travel with Intent to Engage in Illicit Sexual Conduct,
2  in violation of 18 U.S.C. § 2423(b). (ECF No. 68.) It is both legally and factually true
3  that while Defendant was engaging in the enticement and trafficking conduct in the
4  original charges – conduct that he agrees he committed – he also traveled in interstate
5  commerce with the intent to have sex with a thirteen-year-old girl, which constitutes
6  illicit sexual conduct under 18 U.S.C. § 2423(b). (ECF No. 65.)

7       The undisputed evidence of Defendant's conduct is overwhelming, including
8  Defendant's chats, his in-person appearance at the coffee shop to meet the girl, and his
9  recorded recitation of "the rules" (no anal sex, no pregnancy). No bona fide victims
10 would be traumatized by having to testify. After near-certain conviction at trial,
11 Defendant would have faced mandatory minima of 10 and 15 years, respectively, and a
12 commensurate Guidelines range of 188-235 months at offense level 36 (Category I).

13      Against this landscape, the United States' pleading leverage was at its apex. But
14 after more than a year of extensive negotiations with the defense, the United States
15 agreed to resolve the case in a way that would acknowledge Defendant's actual conduct
16 while allowing Defendant the ability to argue for a sentence lower than the otherwise-
17 applicable mandatory minima and the Guidelines range. The basis for the United States'
18 agreement to such a plea is the United States' confidence that the Court will
19 appropriately consider the nature and circumstances of Defendant's deeply troubling
20 conduct, and will not be unduly swayed by what will surely be a comprehensive defense
21 presentation regarding Defendant's personal history and characteristics. The United
22 States anticipates that the Court will recognize that whether mandatory minima apply or
23 not, Defendant's *conduct* in this case warrants a sentence between 10 and 15 years under
24 the factors set forth at 18 U.S.C. § 3553(a), within the stipulated Guidelines range. The
25 United States respectfully submits that such a sentence is sufficient, but not greater than
26 necessary, to meet the statutory goals of sentencing, including the need to avoid
27 unwarranted sentencing disparity; in this District, people who show up in person to have
28 sex with purported minors routinely receive sentences of 120 months and longer.

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 3

III.    **Facts**

The relevant facts are set forth in the *Factual Basis and Statement of Facts* section of the plea agreement (ECF No. 68, ¶ 6) and the *Offense Conduct* section of the Revised Presentence Report ("PSIR").  (ECF No. 73 ¶¶ 11-21.)  The United States has no substantive objections to the PSIR.

There is, however, additional relevant information that is not contained in the Factual Basis of the Plea Agreement or the Offense Conduct section of the PSIR, but eviscerate Defendant's anticipated arguments that: (a) this was his first time engaging in this kind of conduct; (b) this was a mere dalliance by a lonely man rather than something with which he was already familiar; and (c) the Court need not be concerned about the danger he presents to the community because he would never actually have had sex with the minor girl if she had turned out to be real.  By reviewing the actual communications between Defendant and the undercover officer, rather than merely the summaries in the Plea Agreement and PSIR, the Court will see: (1) messages that demonstrate Defendant's fluent vocabulary and prior knowledge about how illicit sex with minors is arranged and traded online; and (2) the fact that on two separate occasions, the undercover officer stopped communicating with Defendant, and it was *Defendant*, not the officer, who re-initiated communications about sex with minors.[1]

The Court will see Defendant's familiarity and fluency with the jargon, shorthand, and vocabulary for commercial sex with children, and that his desire to have sex with a 13-year-old girl was so strong that after responding to an online advertisement for sex with a minor, he could not let that possibility escape, despite the undercover officer disengaging with him twice.

---

[1] Because Defendant's communications with the undercover officer took place on various media over several months, the United States has consolidated them into this brief for ease of review.  The United States is submitting the underlying communications contemporaneously, under seal, for the Court's review as Exhibit A (reports summarizing communications); Exhibit B (emails between Defendant and "J"); Exhibit C (texts between Defendant and "J"); and Exhibit D (texts between Defendant and "K").

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 4

## A.    Defendant Responds to Craigslist Advertisement for a Bicycle

On August 24, 2017, an undercover officer ("UC") posted the following ad in the "Casual Encounters" section of Craigslist, a well-known forum for arranging sex:



The language of the advertisement is specific and important, because it contains coded language that only someone familiar with seeking child sex online would recognize and know how to respond to appropriately. The reason is simple: ads that offer obvious contraband, including sex with children, are immediately taken down by Craigslist. To avoid this, coded language is used and understood by people seeking and offering child sex – particularly in the "Casual Encounters" section of the website, rather than the "For Sale" section, where bona fide bicycles are actually sold.

1    Here, there is no dispute that Defendant knew he was responding to an
2    advertisement for child sex, not a bicycle.  Defendant's familiarity with the jargon of
3    child sex is critical because his anticipated mitigation and lack-of-danger arguments
4    derive from the deeply-flawed and unprovable notion that he was merely a once-lonely
5    man who engaged in this conduct a single time.  The language with which Defendant
6    was familiar and fluent includes the title of the advertisement: "fresh and new," a
7    euphemism that references sexual availability of a child or inexperienced person, rather
8    than an experienced adult.  A person unfamiliar with this phrase might well wonder why
9    someone would describe a bicycle as "fresh and new," rather than just "new" – the
10   gears, tires, and frames of bicycles do not have physical characteristics that one would
11   describe as "fresh."  But in the world of commodifying illicit child sex, this is puffery
12   referring to the sexual inexperience of the person on offer, which is what purchasers like
13   Defendant seek when they are hunting for children.  If there were any doubt, the other
14   signposts on the advertisement make it clear what the offer is for: the post indicates that
15   the "bicycle" is "14 years old," which might be taken literally by someone looking for a
16   bicycle, but in the child exploitation world is clear coded language referencing the age of
17   the child being offered.  Obviously, "only ridden one time" is a thinly-veiled reference to
18   the child only having had sex one time.

19   Defendant cannot credibly claim that he is a babe in the woods with regard to
20   seeking sex with minors online.  In addition to acknowledging in the Plea Agreement
21   that he knew that he was responding to an advertisement for sex with a minor girl and
22   not a bicycle, his messages demonstrate that he knew *exactly* how to communicate with
23   the poster of the advertisement regarding what he was seeking.  Defendant responded to
24   the ad almost immediately, using Craigslist's email-anonymizing function and the
25   username "Adominis goering."  Defendant confirmed the gender of the child within the
26   first few exchanges ("is a f or m ?").  This question eviscerates the argument that
27   Defendant was inexperienced or naïve: bicycles do not have genders, but children do.
28

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 6

In their early chats, Defendant tried to establish trust with the purported father of the girl, offering to do whatever it took to prove he himself was not law enforcement and could be trusted. Defendant had a clear opportunity to disengage when he learned how old the child was. But he did not withdraw; he did the opposite. When Defendant learned that the minor was "13f", meaning a 13-year-old girl, he did not say "Oh no! I have no sexual interest in a child; in fact, I'm going to report you to law enforcement." His response was: "Awesome." In fact, in the initial email exchange that Defendant titled "tell me about that bicycle ?", he exchanged the following messages with the UC:

*August 24:*

| Defendant: | ok, what else can you tell me? |
|---|---|
| UC: | What u want to know? |
| Defendant: | How it rides ? |
| UC: | it wants to be ridden but hasnt yet...trying to find someone we dont know so that its not weird. we are just visiting the area for the fair so we dont run into someone we know |

*August 25:*

| Defendant: | You can trust me. I'm super clean sane and polite. Send me a pic please |
|---|---|
| Defendant: | So tell me, what you need to know from me ? |

*August 26:*

| UC: | I'm not sending pics. That could get me in trouble |
|---|---|
| Defendant: | gotcha. Is a f or m ? |
| UC: | 13f |
| Defendant: | Awesome. Well You can ask me anything I'm pretty sane and chill. |
| UC: | You ever done this b4? |
| Defendant: | No, never. This actually sounds to great to be real lol |
| UC: | Yeah it's a delicacy that isn't always had |
| Defendant: | Had you done it ? What are you to her ? |
| UC: | Yes and doesn't matter |

*August 27:*

| Defendant: | Great, well i respect that. You definally can trust me and I'm on board. |
|---|---|
| UC: | Well, prove to me your on board |
| Defendant: | How can i ?  I wish i could should you that I'm legit |

| Defendant: | So when you guys will be in town and what are the chances of meeting ? |
|---|---|
| UC: | We are in [city in Idaho] but live in [city in Tri-Cities].  Heading home later. |
| Defendant: | So no way of meeting at all? |
| UC: | Have you ever been with someone of this vintage? |
| Defendant: | No, I always wanted to. I had a few times were they would be sleeping and I would be all handsy but nothing more than that. |

For almost three weeks, the UC cut off all communications.  But in September, and again in October after another several-week break, *Defendant* re-initiated contact, including informing the UC that he was masturbating to images of "littles," which demonstrated his child exploitation knowledge and bona fides to the UC:

*September 13:*

| Defendant: | Hey there, how you been ? |
|---|---|
| UC: | Good |
| Defendant: | I'm getting off to little things right now lol |
| UC: | Yeah right! Text me if u r serious 509 [XXX-XXXX] but you have to prove it or I won't reply |
| Defendant: | ok will do, my number is 208[XXXXXXX] |
| Defendant: | You can hit me anytime here, so ask me stuff or share stuff with me, i really want to get you know you and you to know me. |
| UC: | Yea me too but haven't heard back so u just not be interested anymore |

*October 3:*

| Defendant: | I am, just don't wanna freak you out lol i know you are very coutions. But definally i'm super interesting on that. |
|---|---|
| Defendant: | So, if we meet, are you gonna let me meet her ? |
| UC: | Totally cool. I got my number so text me if u want. |
| Defendant: | Ok man, we'll keep in touch. |

*October 5:*

| Defendant: | Just a little friendly hi. [Defendant attached a photo of three minor girls wearing sports bras and briefs that do not constitute child pornography under federal law]. |
|---|---|
| UC: | Damn!  Hot |
| Defendant: | Glad you liked it ;) |

*October 10:*

| Defendant: | You coming to town anytime soon? |
|---|---|

*October 12:*

| Defendant: | This is me, just a regular nice guy.  With a nice fetish ;) [Defendant attached a photograph of himself] |
|---|---|
| Defendant: | You can send me some more pics of you precius if you want |

*See United States' Exhibits A, B.*

### B.    Defendant and UC Communicate Via Text Messages

The UC confirmed that the subscriber of Defendant's phone was "JUAN VAZQUEZ GONZALEZ."  Using this phone number, Defendant continued to text the UC (who was both "J" and "K") to make arrangements to meet "K" for commercial sex.

### 1.    Defendant's Texts with "J" as an Intermediary

Defendant and "J" texted extensively; Defendant made a number of statements demonstrating that he was trying to meet up with "K" for sexual purposes and that he was going to give her Playstation games (asterisks indicate omitted messages):

| Defendant: | Lol yeah I don't wanna freak you out so that's why I don't ask to much stuff or bugg you messaging you often. But I'm very interested. |
|---|---|
| UC: | Totally get it.  Thanks for respecting.  U ever done anything like this.  I'm totally down but I know.  Safety is priority. |
| Defendant: | I never had, always dream about it lol and I understand safety first. |
| UC: | How do u wanna do this?...if u do that is |
| UC: | Too many people fucking around and just talk |
| Defendant: | Well I don't know, you tell me, does she meets me and gives the OK or you do the OK? I don't really know the steps lol |
| UC: | I'd probably give the ok for her then if u r legit and clean and make it worthwhile then I could introduce u.  I'll show her a pic first tho cause I'm not gonna force her to be with an old ass skeezer! |
| *** | |
| UC: | U ever come to the tri? |
| Defendant: | Yes I used to work in richland a while ago. And sounds fair, I'm in my 20's very clean, sane and chill dude. I think I already sent you a pic did I? If no I send one once I get home from my laptop. And you mean that Involve $ ? |
| UC: | Yeah I think u did send one.  Sure, I'm sure she'd love some $ for school clothes...clothes are ridiculous expensive and she likes nice shit...but deserves it.  She's a good kid |
| Defendant: | I bet, she sounds darling. |

| | |
|---|---|
| UC: | That pic was nice |
| Defendant: | So if I go to tri cities when would be best day that work for you guys? |
| | *** |
| UC: | U find another to play with? |
| Defendant: | Lol I wish. Is just the distance and I work weekends. But I really would love to go meet. |
| Defendant: | I live in Spokane, when are you guys coming? |
| Defendant: | Wednesday would be a nice day. |
| Defendant: | Just one of her. Doesn't need to be naked, just want to see how she looks like. |
| Defendant: | Yeah but was a bad quality didn't really got to see how she looks like. I understand you being cautious man, but really I I knew where to find hard core pics like that I probably wouldn't be talking to you, I send some pics to you email, really is about as much as I can find out there. |
| Defendant: | I understand and I appreciate bro, I know you don't know me but you can trust me. |
| | *** |
| UC: | cant believe im even considring this again...shes kinda my toy |
| Defendant: | Understandable bro, in my ayes you are an amazing man. Yes she looks so lovely !! You are one lucky man! |
| UC: | u dont even know lol |
| Defendant: | Dying to know ! I wish I was as lucky as you, I bet she has nice underwears. |
| UC: | yea...send me a pic so i no who u are...im not setting her up with an old ass pervert |
| Defendant: | Just send you a pic of me to you email. [Picture was of Defendant] |
| | *** |
| Defendant: | I have my own room, I have roommates but they usually never here. My room is private. Yes show her my pic let's see what she thinks first. |
| | *** |
| Defendant: | I'll try to make it over there, especially now that she give the OK. |
| UC: | We can go there Wednesday 2 maybe |
| Defendant: | Well that would be nice so we can meet that day. |
| UC: | She's excited. She asked what ur into and what's in it for her.  I think Wednesday night work.  Afternoon.  She's out of school early that day |
| Defendant: | I'm definitely excited too, and I'm into her!  She is super pretty! And I honestly don't know what is for her, you tell me what would sound right? I do have a full time job but I make minimum wage though. |
| UC: | I don't know but u tell me and I'll see if she's cool with it. |
| Defendant: | Well I don't wamy to said a number that will insult you guys. Tell me how sounds good, and I tell you if I can do that. |

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 10

| | | |
|---|---|---|
| 1 | UC: | Idk, it'll take a lot of time.  Only done this once b4 with my other bike.  Seemed it was higher than normal CL but not crazy. |
| 2 | UC: | Make an offer but keep in mind I will probably spend like $75 in gas.  Everything else is for her |
| 3 | | |
| 4 | Defendant: | Well then I can just come to you guys, that way you don't have to spend coming all the way here, I thought you were already coming here for something else. |
| 5 | | |
| 6 | Defendant: | She is so pretty, I'm happy she is excited ! |
| 7 | UC: | Yeah we are but this is a novelty that's not free...school clothes are expensive! |
| 8 | UC: | What you think?  That I was giving her away? |
| 9 | Defendant: | No I didn't think that bro, like I said I could give her something for her expenses. I want to meet her and she to meet me, so you guys can see that I'm no just some asshole creep guy. I will treat her very good, like a good Princess that she is. |
| 10 | | |
| 11 | UC: | She doesn't have expenses.  It's her body tho.  Tell me what u wanna do and Ill ask her.  We can probably come up there Wednesday or u can come here but u gotta have a place |
| 12 | | |
| 13 | Defendant: | I do have a private room, well if you guys come Wednesday we could meet for coffee then see from there, once we all see we are the real thing and we like what we see. |
| 14 | | |
| 15 | UC: | Yea well I'll leave her in a safe spot until I know ur not playing with me.  If we make a deal then I'll bring her to u |
| 16 | | |
| 17 | *** | |
| | Defendant: | I'm excited to meet her, what's her name? |
| 18 | UC: | [K] |
| 19 | UC: | would like 530 be ok to hook up?  If it all goes well, where do u wanna take her? |
| 20 | UC: | And u gotta be prepared to make it worth her time and she cant get preg |
| 21 | UC: | Sorry bro...my rules.  gotta keep evry1 safe |
| 22 | Defendant: | I like that name, and yeah I wouldn't want her to get preg either, I would make her time very worth it!  And totally understand those rules bro, sounds fair to me. In that number $ though is unreachable for me, like I said I just a guy on a minimum wage now, trying to get a degree, have school and work and all that comes with that. But hey we should meet and go from there worts case we became very good friends, I seriously just a normal chill guy. |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | UC: | whats the $ unreachable mean?  I dont get it.  totally get ur degree bro...thats what i did and totally worth it |
| 27 | | |
| 28 | UC: | im not looking to make friends...just a business deal...if we like it we could do it again |

| | |
|---|---|
| UC: | I sound chill but I'm not gonna waste each other time u know. We gotta go there for other stuff so lucky for you it won't cost much |
| UC: | I don't know my way around there much |
| Defendant: | OK yeah I know where that Starbucks is by gonzaga, and hey man being totally honest with you, I don't have that kind of cash laying there. |
| UC: | You have anything to offer her? |
| UC: | She also plays video games |
| UC: | She likes clothes 2 |
| UC: | But whatever then...your loss |
| Defendant: | Sweet I have a ps3 I could give her some games? Some cash and of course being super nice and great to her. |
| *** | |
| UC: | Yea so like what exactly do you want to do with her |
| UC: | Shit, I can give her your number to text if u want. It's a text only number tho |
| Defendant: | Would be totally up to her, I want for her to know me and see what she thinks of me, then go from there, I want to hang with her and she can decide what she wants to do. |
| Defendant: | Yes that would be great, I would just text and I will be very respectful. |
| UC: | yea fuck that...shes not just wantin to hang out....nor do i want to spend all night fucking around waiting for her |
| Defendant: | Lol would be a quick chill so just she can get to know me a bit, won't be a whole day deal lol would be nice to text her and see what she thinks. |
| UC: | 509 [XXX-XXXX] |
| UC: | She's gonna ask what u want and what you'll give her |
| UC: | She wants to no what to expect. I don't blame her |
| Defendant: | Sounds fair. |
| UC: | She's on her way home now. I told her you'd text. Let's figure this shit out. Otherwise fuckit |
| Defendant: | Ok |
| UC: | Is CDA too far 4 u to go tomorrow? |
| UC: | Shits cheaper there |
| Defendant: | No to far. |
| *** | |
| Defendant: | I understand man, I'm no talking about sex because is no how I am, and also to be cautious. If it feels weird to you, it also feel weird to me. |
| UC: | Is sex what you want or are u just wasting time? We can talk about the rest tomorrow |
| Defendant: | Definitely no trying to waste you time or mine. |
| *** | |

| UC: | Here's the rules |
| --- | --- |
| UC: | She can't get pregnant. |
| UC: | U gotta stop if she says so |
| UC: | And u gotta tell me what u want. |
| UC: | Otherwise we will move on. |
| UC: | HMU if you wanna do this otherwise I'm canceling my hotel and we will just leave and come home tomorrow |
| UC: | It's all good bro...not for everyone. At first I was thinking ur just playing but now I think ur just scared. Me to. |
| Defendant: | A bit scared yes, but I'm real, and just like you, trying to play safe. |
| UC: | I get it man but these are all questions I need to know. Hope u understand. I'm getting shit from her cause I said it's probly not happening. She just wanted to no what she was getting into. Some dude tried anal and she didn't want that. She said you're only into reg sex. I want her to be comfortable |
| UC: | She wants to explore new things u no and when she found out people get paid for it she was totally down. That's why I placed that ad. Not to play around but I get being cautious. Hell, I am too |
| UC: | Damn I wish we were past this cause i like how cautious u r |
| UC: | Means u won't report me |
| UC: | Or tell any1 |
| Defendant: | OK definitely no anal and I wouldn't do anything she doesn't. I'm super discrete and I want to believe you guys are the real deal but I have my doubts too, and yes I wish we were past this too lol |
| *** | |
| UC: | The law sucks. Fuck them and the people who tell me what to do with my kids |
| UC: | I love them and will raise them how I see fit |
| Defendant: | Well that makes me feel better, I'm very discreet and I want to be safe too. I like that you are like this, I feel if I have daughters I would be the same, we don't need the government to babysitter us, we should raise our family how we want. |

*See United States' Exhibits A, C.*

## 2. Defendant's Direct Texts with "K" Herself

At the same time that Defendant was texting "J", he also was directly texting "K":

| UC: | i think i like ur hair...u look pretty hot |
| --- | --- |
| UC: | im kinda nervis but want this so bad |

| | | |
|---|---|---|
| UC: | dad dont make me do anything i dont want to.  its weird but i think he gets off to this | |
| UC: | so do i...lol | |
| Defendant: | Lol well sounds hot, and you are very pretty. | |
| UC: | TY | |
| UC: | R U big...i dont wanna get hurt | |
| UC: | kinda nervis | |
| Defendant: | Lol no, I wouldn't consider me big, pretty standard size lol | |
| Defendant: | I know I am too. Lol | |
| UC: | omg i got a funny jittery feeling...gawd!  Im excited | |
| Defendant: | Nervous. | |
| UC: | wtf does that mean | |
| UC: | standard size...guys my age arnt big | |
| Defendant: | Well I don't think I'm much bigger lol | |
| UC: | prove it | |
| Defendant: | Lol I don't feel right by sending those kind of pics. | |
| UC: | wtf...why not...thats weird | |
| UC: | but whever then | |
| Defendant: | Lol could be weird now days but I'm very shy I had never send nude pics to chicks. | |
| UC: | thats cool...like how do i no u arent just messing with me | |
| UC: | dad said ur being weird and wont even say what u want...hes gonna cancel cause he thinks ur a cop or somthin | |
| Defendant: | Or you with me? I want you to get to know me and vice-versa, then we can figure out a bit from us, I won't push anything, just want to see what's up with you. | |
| Defendant: | What I want, would be up to you to decide, I want us to get to meet and then you can decide what you wanna do. | |
| UC: | fuck...i was just tryin to find guys who dont play games and judge me...i dont want to just chill...thats why we r on the internet.  no games.  If I wantd gamz id chill with guys my age | |
| Defendant: | I agree no games here. | |
| UC: | then whay we gonna do?  I just dont wanna get hurt...down for anything cept u call me names and ill be pissed | |
| Defendant: | Down for anything too, no into piss, poop, or pain. Just some good ole fun. | |
| UC: | well piss and poop covers both sidessss...then what r u into...totaly dont get what ur saying | |
| UC: | i dont like piss or poop either?  WTF | |
| Defendant: | I'm into normal sex I guess? | |

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 14

| | |
|---|---|
| Defendant: | Lol good deal that you don't then |
| UC: | i like sex too...wish i new more how 2 do it betr |
| Defendant: | Well I guess comes with experience. No one is born knowing everything about it. |
| UC: | yea i guessss...i like sex but really only had real sex a couple times. it was fun but not like i thot |
| Defendant: | Yeah, it helps when the 2 are into each other and there is an attraction. |
| UC: | yea but im not realy wantin a marage or anythin...just heard people make money to do fun things u no |
| UC: | plus i totally wish i was onld enough 4 a real job but im not so i guess ill just have fun doing whatevr |
| Defendant: | Definitely no looking for marriage Here. And I have no much cash to offer. |
| UC: | like any? I toatly wanna get a new game. |
| Defendant: | What game? |
| UC: | idk...i really like building worlds on minecraft...those r the kind i like |
| UC: | my friends think im weird but i think those games make me smarter |
| Defendant: | Nice, yeah I played that. |
| Defendant: | I have a ps3 and a ps4 |
| UC: | i have a ps4 at my moms but i dont get to play much...i play a 3 a lot but dont have many games |
| UC: | id totaly do like anything for a ps4...realy wish i culd get 1 |
| Defendant: | I could give you a bunch of ps3 games, they are brand new, I don't use them much. |
| UC: | OMG really! Thatd be cool |
| Defendant: | No problem. |
| UC: | like what do i gotta do |
| UC: | no piss or poop lol! |
| Defendant: | lol just be yourself. |
| UC: | games games and more gamessss...thot guys here were real and take control...whatev. bye. |
| Defendant: | I don't see how is that games, I'm being real. |
| UC: | cuz i wanna make sure ur not a creep and that i no what u want and its ok with me...the last guy tried doin stuff that i dont think was normal and called me weird names |
| UC: | i just want u to tell me what i gotta do...just dont wanna get into somethin not ready 4 |
| UC: | WTF happened? I thot we were getting together tomorrow. Dad said ur not talking anymore |
| Defendant: | Yes we are, sorry I'm at work right now. Got busy. |

| | | |
|---|---|---|
| 1 | UC: | Cool.  U got a job?  Like a real one?  I wish I was old enough for a job |
| 2 | UC: | Wanna get paaaaaiiiid!  Lol! |
| 3 | UC: | If we do this u promise I won't get pregnant? |
| | UC: | My friend did and it fucked up her life |
| 4 | UC: | She's 14 and dropped |
| 5 | UC: | Out of school and literally like has no friends |
| 6 | Defendant: | Definitely you are no getting pregnant, we don't want that. And yes is a real full time job, enjoy now that you just do school. |
| 7 | UC: | That's just the scary part cause she said she didn't think she was gonna get preg eithr |
| 8 | UC: | U promise |
| 9 | Defendant: | I promise, I'm a gentleman, I will treat you like the princess that you are. ☺ |
| 10 | UC: | That's sweet but my dad still will want to make sure ur cool first...and I |
| 11 | | told him ur giving me games...u no that even if u give me PS3 games it's not for weird stuff.  Only normal. |
| 12 | Defendant: | OK sounds good to me. |
| 13 | UC: | How do u want it.   Ima gonna watch a few videos so I don't laugh at me...sorry I only done this some b4 |
| 14 | Defendant: | You'll be fine, don't worry. |
| 15 | UC: | I wanna watch some anyways...lol |
| | Defendant: | Lol yes is fun and healthy to do it. |
| 16 | UC: | Wish you'd tell me what u want so I can see it. |
| 17 | UC: | I wanna have good dreams |
| | UC: | Omg I couldn't sleep good!  I lovvvre! Ur hair |
| 18 | Defendant: | Thanks, Hey what's your facebook? |
| 19 | UC: | It's my name |
| 20 | UC: | I don't use it much tho |
| | Defendant: | [K] and what's you last name |
| 21 | UC: | What's urs?  I'll send a request if I can remember my password. |
| 22 | Defendant: | Adominis Goering, just tell me you last name I'll find you. |
| | UC: | Ur lying...u said ur name was Alonso |
| 23 | UC: | [Last name redacted] |
| 24 | Defendant: | No lying, my name is Alonso, but my facebook is like that because I started making to play games, but you can see is me. |
| 25 | Defendant: | Can't find you. |
| 26 | UC: | Gtg...at school 4 bit |
| | Defendant: | Alright, have a good day at school. And text me how to find you on fb. |
| 27 | UC: | I think it's just my name.  Maybe it's private.  Idk.  Don't use fb |
| 28 | Defendant: | What is you dads name? |

| UC: | why |
|---|---|
| UC: | his name is [J] |
| Defendant: | Does he has facebook? I just want to make sure I'm talking to real people and no some kind of scam or something like that. |
| Defendant: | Why are you guys coming to Spokane? |
| UC: | yea he has 1 but i dont think he uses it mcuh..  going to a doc appointment. |
| Defendant: | Do you have a pic of you and you dad, that you can send me? |

*See United States' Exhibits A, D.*

### C.   Defendant Shows Up at the Arranged Time and Place to Meet

At the arranged time on October 18, 2017, Defendant met "J" at a certain coffee shop in Spokane.  Defendant did not bring condoms or Playstation games with him; he did not need to.  In a recorded conversation, Defendant told "J" that he could take "K" back to Defendant's apartment where he had condoms and "K" could choose from his Playstation games.  Defendant also told "J" that he could turn the volume up on the TV in his room to ensure that his roommates would not hear him having sex with "K." Finally, Defendant recited back to "J" "the rules," including that he could not get "K" pregnant and he could not engage in anal sex with her.  Defendant was arrested without incident and invoked his rights to silence and counsel.  *United States' Exhibits A, C.*

## IV.   The Presentence Report

For purposes of calculating the appropriate range under the United States Sentencing Guidelines (the "Guidelines"), the Probation Officer concurs with the United States and Defendant that Defendant's final adjusted offense level is Level 30.  (ECF No. 73, ¶ 30; ECF No. 68, ¶¶ 8(d).)  The Probation Officer concluded that Defendant has 0 criminal history points, placing him in Criminal History Category I.  (ECF No. 73, ¶ 43.)  Defendant's Guidelines range is 97-121 months.  (ECF No. 73, ¶ 105.)

## V.   The United States' Sentencing Recommendation

In light of the Plea Agreement, the United States Sentencing Guidelines, and the factors set forth at 18 U.S.C. § 3553(a), the United States respectfully recommends the following sentence: 120 months in custody, 20 years of supervised release, no fine or

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 17

restitution, and special assessments of $100 (mandatory) and $5,000 (absent a finding of indigence by the Court). The United States respectfully submits that such a sentence is appropriate in light of all of the factors set forth at 18 U.S.C. § 3553.

### A.    The Nature and Seriousness of the Offense and Defendant's Respect for the Law

Defendant's sentence should be significant; here, a Guidelines sentence of approximately 10 years, followed by 20 years of supervised release is necessary to account for the severity of Defendant's offense and lack of respect for the law. The Court needs only to look at Defendant's exchanges with a person he believed to be a thirteen-year-old girl to recognize that *but for* "K" being a 43-year old Detective, Defendant was going to have sex with a child on October 18, 2017. He described the size of his penis, his preferred sexual acts, and the Playstation games he was going to give the child. He had a plan for how to ensure that his roommates would not hear him having sex with her; he would turn the TV up loud. He complimented her and made sure she knew he was not going to get her pregnant or engage in anal sex with her. And he certainly had no doubts about her age; Defendant telling the child to "have a good day at school" while grooming her for commercial sex is particularly chilling.

Most importantly, *Defendant showed up at the coffee shop to have sex with the child.* Yet, in stark contrast to that act, coupled with his stated messages and desires – to say nothing of common sense and reality – part of the defense in this case is that Defendant would never have actually touched the child because his true intentions were just to get to know her. That is malarkey, and Defendant's messages and conduct prove it. He is entitled to create his own defense, but he is not entitled to create his own facts.

Literally the only way to prove whether Defendant was going to have sex with a thirteen-year-old girl that day would have been to have an actual thirteen-year-old girl show up to meet Defendant for sex as he requested. But law enforcement is never going to knowingly endanger a child by putting her in that position. The United States simply has to rely on the Court to come to the reasonable and common sense conclusion that

1   Defendant was there to do what he said he was there to do – without actually offering a
2   live thirteen-year-old girl as bait for a predator.  For that reason, the United States urges
3   the Court to reject any arguments that Defendant presents no danger to the community
4   because no real child was harmed or that the only victim here was a law enforcement
5   officer pretending to be a child.  Defendant's conduct demonstrates why an undercover
6   operation is often the only way to identify and apprehend someone who sought out – and
7   would have engaged in – sex with a child.

8          **B.    Defendant's Personal History and Characteristics**

9          Defendant's personal history and characteristics do not absolve him of
10  responsibility for his actions; having no criminal history to speak of does not erase his
11  sexual interest in "K" or the steps he took to consummate it.  To the contrary, unlike so
12  many Defendants before this Court, Defendant is well-educated, and has held numerous
13  jobs as a painter and casino employee.  Also unlike many Defendants before this Court,
14  he had an "amazing" childhood (ECF No. 73, ¶ 49) and appears to have had open to him
15  many opportunities in life.

16         The anticipated mitigation arguments presented by the defense, which are
17  designed to demonstrate Defendant's social support structure and low risk of
18  reoffending, ring hollow in light of *Defendant's* choices and actions.  If his wife, friends,
19  children, parents, siblings, and employers were meaningful checks on his behavior, he
20  would not be proceeding to sentencing in a federal child exploitation case.  The
21  argument that his "tremendous lonel[iness]" somehow created in him the desire to have
22  sex with children, and *that* caused him to turn to the Internet (ECF No. 73, ¶ 62) is
23  nonsense.  Sexually well-adjusted adults, whether post-divorce or not, find themselves
24  lonely all the time but never even think of seeking out sex with a child.  The United
25  States urges the Court to reject Defendant's attempts to normalize his behavior as just an
26  explicable way of curing post-divorce loneliness.

27         Defendant and the PSIR give inordinate weight to a defense-friendly psychosexual
28  evaluation, in which all of the information came from one source: Defendant himself.

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 19

1  (ECF No. 73, ¶ 67).  Obviously, Defendant knew how to answer the psychologist's

2  questions in such a way that the report would come back concluding that he is a low-risk

3  offender.  Defendant, who knew exactly why his lawyer set up the interview with the

4  psychologist, knew better than to answer "I have a voracious and unceasing sexual

5  appetite for children," even if that is true.  The Court should bear in mind the self-

6  serving source of information for the entire report, and discount it accordingly.

7         Moreover, the psychologist is neither a medical doctor nor a neutral and detached

8  evaluator, and the Court should consider his bias when analyzing the merits of the

9  evaluation.  The very language Dr. Lisota uses should give the Court pause about his

10  neutrality:

11  • Dr. Lisota repeatedly dismissed the undercover operation as a "sting";

12  • Dr. Lisota repeatedly refers to the "victim" in quotes as though Defendant's
       conduct is nothing more than a victimless crime;

13  • Dr. Lisota characterizes Defendant as feeling "'pushed' into the situation leading

14     to his current charge as opposed to something he was actively pursuing," *despite*
       the facts that Defendant answered the Craigslist ad himself, and twice re-initiated

15     contact with the UC; and

16  • Dr. Lisota asserts that sexual deviance "can be ruled out" because despite
       admittedly arranging to have sex with a thirteen-year-old, Defendant has no

17     "Hebephilic sexual interest" (that is, sexual interest in thirteen-year-olds).

18  *Id.*  The Federal Defenders in this District routinely present psychosexual evaluations

19  from Dr. Lisota, their preferred psychologist, and his diagnosis are always shockingly

20  similar: the Defendant is always a low risk for future offenses, *no matter what conduct*

21  *he has already conducted*.  The United States suspects that Dr. Lisota would have come

22  up with the same low-risk diagnosis for Defendant even if he had interviewed Defendant

23  the day before Defendant responded to the UC's Craigslist ad in August 2017.

24         The bulk of Dr. Lisota's actual conclusions fall into the category of "other than

25  that, Mrs. Lincoln, how was the play?" because he simply sets aside the truth of what

26  Defendant has actually done.  According to Dr. Lisota, Defendant appears to present no

27  risk at all – as long as one sets aside his *actual conduct* in this case.  Dr. Lisota

28  concludes that there is no evidence that Defendant suffers from any paraphilias

1   (abnormal sexual interests) – "beyond the behaviors which led to his current charge."
2   (ECF No. 73, ¶ 67.)  Defendant likewise has no "history of sexually abusive behaviors"
3   – except that we are now at sentencing for Defendant's sexually abusive behavior.  It
4   seems that as long as the Court is willing to ignore the facts of this case, Dr. Lisota can
5   confidently represent that Defendant does not have a sexual interest in children, and will
6   not act on it again.

7       Even Dr. Lisota's semi-diagnoses are thin at best and meaningless at worst: to
8   whatever extent Defendant suffers from "unspecified anxiety" and "borderline
9   intellectual functioning," those issues appear to have presented only after the fact, when
10  Defendant's lawyer obtained a psychologist whose conclusions could all but be assured.
11  Indeed, even Dr. Lisota has to conclude that Defendant's psychological issues, such as
12  they are, do "not ris[e] to a level that would warrant a specific diagnosis."  (*Id.* at p. 13.)
13  Without issues that rise to a "specific diagnosis," it is difficult to see why the Court
14  would place significant weight in Dr. Lisota's conclusion that Defendant presents a low
15  risk for recidivism.

16      Likewise suspect is Dr. Lisota's conclusion that Defendant "presents as higher
17  functioning than he actually is" – what the Court knows with certainty is that Defendant
18  was functioning at a high enough level to engage in months-long communications across
19  various platforms with two different individuals, and had the capacity, will, and function
20  to show up to complete an agreed-upon commercial sexual transaction with a child, and
21  knew enough to cover it up from his roommates by blaring the TV.  Defendant need not
22  function at a level higher than that to present a danger to the community.  Even Dr.
23  Lisota cannot avoid concluding that Defendant's likely future victims would be an
24  underage girl whom he would groom as he did here.  (ECF No. 73, ¶ 67, at p. 14.)

25      Similar problems plague any reliance on the defense-administered polygraph
26  examination.  (ECF No. 73, ¶ 68.)  As the Court well knows, such examinations are
27  inadmissible for many reasons.  The United States would urge the Court to take the
28  results of that examination with a shaker of salt, given the way the polygrapher asked the

1    ultimate questions: Defendant would have passed those questions on the polygraph on

2    the day *before* he responded to the UC's Craigslist ad, just as he did after.

3         The United States also anticipates the defense argument that because Defendant is

4    likely to be removed from the United States upon the completion of his prison sentence,

5    the Court should *lessen* his period of incarceration.  This position, if offered, is troubling

6    for a number of reasons.

7         First, shortening the sentences of Defendants who are likely to be removed creates

8    potential Equal Protection and Due Process concerns, because that approach would

9    disfavor similarly-situated Defendants who are *not* subject to removal.  A person's

10   citizenship or immigration status should not dictate the length of a person's incarceration

11   for a child exploitation crime; one can image how problematic it might be for the United

12   States to argue the inverse proposition that Defendant should receive a *longer* sentence

13   for his child exploitation crime because he is a Mexican citizen/legal permanent resident.

14        Second, Defendant's likely removal has nothing to do with his sexual pursuit of

15   "K"; removal is the natural consequence attendant to entering the United States illegally

16   and then committing a serious crime.  The United States did not charge Defendant with

17   violating 8 U.S.C. § 1325 (illegal presence in the United States).  In this case, he should

18   be sentenced based on his child exploitation conduct, not based on his collateral

19   immigration consequences, whatever they may be.

20        Third, unlike so many people who are forced to enter the United States illegally

21   because of economic desperation or persecution, Defendant was admittedly in a stable,

22   economically sound situation in Mexico and simply decided as a young man that there

23   were more opportunities for him in the United States.  But instead of playing by the rules

24   and applying for a visa to enter the Eastern District legally, as many other people do, he

25   simply entered illegally.  (ECF No. 73, ¶ 57.)

26        Finally, Defendant is not similarly situated to the many Mexicans, Hondurans,

27   Salvadorans, and Guatemalans, among others, who enter the United States illegally and

28   then work hard to support their families without committing any crimes beyond illegal

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 22

entry. If Defendant, after entering the United States illegally, had simply been a painter and casino employee who obtained legal permanent residence by marrying a United States citizen and then raised his children without preying on *other* children, he likely would not face removal at all. The danger Defendant presents has nothing to do with his immigration status; it has everything to do with his demonstrated sexual interest in children and the cold, hard fact that he pursued a child for sex. Indeed, if Defendant had not pursued a child for sex, he would likely have been eligible to apply for United States citizenship this year. (ECF No. 73, ¶ 57.)

In sum, Defendant's personal history and characteristics do not warrant a sentence lower than 120 months, and his likely removal from the United States afterward is an appropriate response for engaging in egregious criminal conduct after his illegal entry.

### C.    Just Punishment

Defendant's significant child exploitation conduct speaks for itself, and demands serious punishment. The only mechanism for creating accountability in this process is the sentence imposed by this Court. Every thirteen-year-old girl in Eastern Washington deserves to live in a world in which she is safe from Internet predation. When someone violates the law so egregiously – to say nothing of violating moral and ethical codes and the human law that adults are obliged to protect children from harm, not endanger them – the orderly functioning of society demands that the person be punished significantly. Here, a sentence of 120 months is sufficient, but not greater than necessary, to achieve that goal.

### D.    Deterrence

A 120-month sentence is necessary to deter Defendant and others from engaging in additional child exploitation offenses. Only if people with active sexual interests in children know that they may go to federal prison for a long time will they be disincentivized from acting on their worst impulses. Ten years is such a term, and it is appropriate in this case.

### E.    Protection of the Public

Defendant presents a danger to the community, and he would still be endangering children if the UC had actually been a thirteen-year-old girl, because he might have continued to avoid detection by law enforcement.  The question for this Court is stark: what sentence is necessary to protect the children of Eastern Washington from an adult who spends two months arranging to have sex with a thirteen-year-old girl, and then shows up to do so?  The United States submits that the children in this community deserve to be protected from Defendant for at least ten years; in cases like this, the community depends on the Court to be its voice.

The statutory maximum sentence is 30 years under 18 U.S.C. § 2423(b); there are probably some members of the public who would be outraged that the United States would advocate for, and the Court would consider imposing, a sentence lower than that for an adult man who so brazenly sought out hands-on, penetrative, vaginal sex with a child.  But here, the United States Sentencing Guidelines, Plea Agreement, and sentences for similarly-situated Defendants in this District militate in favor of the conclusion that a sentence of 120 months is sufficient, but not greater than necessary, to achieve the statutory goal of protection of the public.

### F.    Avoidance of Unwarranted Sentencing Disparities

The best way to ensure consistent sentences for similarly-situated defendants across the country is for courts to apply the sentencing Guidelines in the same manner everywhere.  *United States v. Guerrero-Velasquez*, 434 F.3d 1193, 1195 n.1 (9th Cir. 2006) (recognizing that the Guidelines "help to maintain uniformity in sentencing throughout the country"); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly.").  Here, mindful that the Guidelines are always "the starting point and the initial benchmark," *United States v. Carty*, 520 F.3d 984, 991-92 (9th Cir. 2008), the United States recommends a sentence just under the high-end of the Guidelines: 120 months.

Because Defendant has pleaded guilty to travel with intent to engage in illicit sexual conduct, he is not facing a mandatory minimum sentence and his Guidelines range is 97-121 months. A within-Guidelines sentence of 120 months is consistent with Defendant's *conduct*, particularly when the Court takes into consideration the statutory factor of avoiding unwarranted sentencing disparity. Sentencing is more art than science, and Defendants are different by definition. But in this District, Defendants who engage in the same or similar conduct as Defendant Vazquez-Gonzalez – arranging and then showing up to engage in a commercial sexual act with a child – routinely receive sentences of 120 months and higher.

Defendant's conduct is meaningfully identical to the Defendant's conduct in *United States v. Rosier*, 4:17-cr-06011-EFS (E.D.WA. 2018), in which the Defendant sent a message to a 16-year-old girl on an online platform, indicating he would be in the "tri cities" over the weekend and was looking for a "hookup." (*Rosier* ECF No. 80.) Unbeknownst to that Defendant, law enforcement agents had assumed the minor's account and were communicating using her persona. The Defendant learned that the 16-year-old had a younger friend who was 13 years old and might also be available; the Defendant agreed that it would not be an issue for the girl to be younger. The Defendant arranged the commercial sex act and directed the girls to come to his hotel room, where he was arrested. The Honorable Edward Shea, United States District Judge, sentenced the Defendant to 120 months for attempted child sex trafficking. (*Rosier* ECF No. 88.)

Here, Defendant similarly engaged in conversations with "K" and "J" to set up a commercial sex act with a child. As in *Rosier*, Defendant knew that the girl with whom he would have sex when he showed up was just 13 years old. As in *Rosier*, Defendant expressed fear of getting in trouble with the law, *yet proceeded to show up to meet her anyway*. As in *Rosier*, Defendant was willing to pay for sex with the child: Defendant told "J," her purported father, that he could "give her something for her expenses," which constitutes child sex trafficking. And most importantly, but for the fact that the Defendant was actually communicating with an undercover officer, *Rosier* and

Defendant would each have engaged in sex with a thirteen-year-old girl. Defendant's conduct, like *Rosier*'s, warrants 120 months; a lower sentence would create an unwarranted sentencing disparity with Defendant Rosier, who was similarly-situated.

In another recent case (with the same prosecutor and defense lawyer), this Court sentenced Defendant Jonathan Holden to 240 months in prison for attempted enticement of a minor and remote child pornography production. *United States v. Holden*, 4:18-cr-06036-SMJ (*Holden* ECF No. 65). In *Holden*, the Defendant posted a Craigslist ad to which law enforcement responded using the persona of a 13-year-old girl. *Id*. The Defendant believed he was communicating with the 13-year-old, and arranged to meet up with her for sex at a nearby restaurant. *Id*. His digital devices revealed that he had also been soliciting child pornography from minors around the country, and during the investigation a different minor disclosed that he had touched her inappropriately.

The Defendant's conduct in *Holden* was more egregious than this Defendant's, to be sure, and the Rule 11 Plea Agreement in that case contemplated a sentence of 20 years, which this Court imposed. Without his hands-on conduct and remote solicitation of child pornography, the Defendant in *Holden* would be in a similar position as Defendant Vazquez-Gonzalez; if Defendant Holden had been so situated, the United States would have insisted on a plea to at least 10 years. It is fair to say that at least ten years of Defendant Holden's 20-year sentence was for arranging to meet a person whom he believed to be a 13-year-old girl for sex.

*Rosier* and *Holden* are not exceptional. In *United States v. Allison*, No. 17-CR-6044-SMJ, this Court sentenced a Defendant to 135 months for traveling with intent to engage in illicit sexual conduct. (*Allison* ECF No. 40.) The Defendant in *Allison* responded to an online advertisement for sex and began communicating with a person who purported to be 13 years old, but was in fact an undercover officer. (*Allison*, ECF No. 41.) Over several weeks, the Defendant in *Allison* exchanged messages with the purported minor, in which he repeatedly discussed the kinds of sex he wanted to have with her, sent her photographs of himself, and requested sexual photographs of her. *Id*.

United States' Sentencing Position – Juan Vazquez-Gonzalez – page 26

He was arrested when he showed up to meet the purported child.  *Id.*  Thus, for conduct *nearly identical* to Defendant Vazquez-Gonzalez's conduct, this Court imposed a sentence of 135 months, at the top of a Rule 11(c)(1)(C) range of 90-135 months. (*Allison*, ECF No. 47.)  If a sentence of 120 months here creates an unwarranted sentencing disparity with *Allison*, it is because it is too low, not because it is too high.

In *United States v. Guthmiller*, CR No. 4:17-CR-06034-EFS, the United States recommended a sentence of 95 months, and Judge Shea imposed a sentence of 84 months where the Defendant made all the same online arrangements that Defendant did, but did not actually get out of his truck when he showed up to meet the child.  The United States recognized this partial withdrawal when negotiating the resolution of the case, and offered Defendant a plea agreement to attempted receipt of child pornography, which carries only a 60-month mandatory minimum sentence.  (*Guthmiller* ECF No. 32.)  Here, unlike the Defendant in *Guthmiller*, Defendant got out of his car at the coffee shop and engaged in person with the UC, explaining exactly how he would turn the TV up while having sex with the girl at his apartment, where he also had condoms. Defendant's conduct was more egregious than the Defendant in *Guthmiller*, because he was clearly prepared to go through with the commercial sex act.  Other cases with similar conduct result in similar sentences, regardless of the ultimate charges:

| Defendant | Case | Conviction | Custodial Sentence | Supervised Release |
|---|---|---|---|---|
| Jerry Lindsey, Jr. | 16-06023-RMP | Attempted Enticement of a Minor | 120 months | 5 years |
| Thomas Lafontaine | 15-06017-EFS | Attempted Enticement of a Minor | 120 months | 25 years |
| John Heath | 15-06013-EFS | Transfer of Obscene Materials (Attempted Enticement of a Minor dismissed as part of plea) | 96 months | 3 years |
| Felix Diaz | 15-06004-SMJ | Attempted Enticement of a Minor | 84 months (after 5K) | 10 years |
| Timothy Shelly | 09-00089-RHW | Coercion of a Minor / Travel with Sexual Intent | 144 months | lifetime |

To avoid unwarranted sentencing disparity with similarly-situated Defendants in this District – and across the country – a sentence of 120 months, slightly below the top of the Guidelines range, is necessary and appropriate. Because District Judges consider all the factors set forth at 18 U.S.C. § 3553(a) during every sentencing proceeding, and Defendants all have different personal histories and characteristics, it is impossible to generate a perfect apples-to-apples sentencing comparison. Indeed, as happened here, Defendants sometimes plead guilty to lesser charges in exchange for the dismissal of more serious charges carrying high mandatory minima. The United States makes this point in anticipation of Defendant's likely recommendation of a below-Guidelines sentence for a person whose conduct did not consist only of traveling with the intent to have sex with a child, as charged in under 18 U.S.C. § 2423(b), *but actually showed up to meet the child for sex*. A sentence below 120 months would create an unwarranted sentencing disparity with Defendants who are similarly situated based on their conduct.

Defendant's plea agreement allows him to avoid 10- and 15-year mandatory minima, but that does not mean that 120 months is an inappropriate sentence, or one that would be inconsistent with sentences for similarly-situated Defendants in this District. Defendant's count of conviction does not change the nature of his conduct: for months he sought out sex with a minor, and he was willing to buy the child videogames or give her money in exchange for penetrative vaginal sex with her. In light of Defendant's conduct, and because similarly-situated defendants should be treated similarly, a 120-month sentence is appropriate.

## G. Fine, Special Penalty Assessment, Restitution, and Forfeiture

The United States and Defendant are free to make whatever recommendation concerning the imposition of a criminal fine that they believe is appropriate. (ECF No. 68, ¶ 13). The Probation Officer has analyzed Defendant's financial condition and has concluded that he does not have the financial means, assets, and/or resources available to reasonably make payment on financial obligations imposed by the Court. (ECF No. 73, ¶ 83). Accordingly, the United States does not seek a fine.

1     A $100 special assessment is mandatory.

2     The United States defers to the Court regarding Defendant's indigence and the

3  applicability of the $5,000 Special Assessment pursuant to the Justice for Victims of

4  Trafficking Act of 2015.

5     A preliminary order of forfeiture has been submitted to the Court.  (ECF No. 60.)

6  **VI.    Conclusion**

7     For the foregoing reasons, the United States recommends that the Court conclude

8  that Defendant's Guidelines range is 97-121 months, and impose a sentence of 120

9  months in custody and 20 years of supervised release.

10  Dated: August 20, 2019              William D. Hyslop
                                        United States Attorney
11

12                                      *s/ David M. Herzog*
                                        _____
13                                      David M. Herzog
                                        Assistant United States Attorney
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on August 20, 2019, I electronically filed the foregoing with

3    the Clerk of the Court using the CM/ECF System which will send notification of such

4    filing to Defendant's counsel of record using the CM/ECF system.

5

6                                    *s/ David M. Herzog*

7                                    David M. Herzog
                                     Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28