1  William D. Hyslop
2  United States Attorney
   Eastern District of Washington
3  David M. Herzog
4  Assistant United States Attorney
   Post Office Box 1494
5  Spokane, WA 99210-1494
   Telephone: (509) 353-2767
6

7              UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF WASHINGTON
8

9  UNITED STATES OF AMERICA,          No. 2:17-CR-00209-SMJ-1

10                    Plaintiff,       United States' Response To Defendant's
11                                      Sentencing Memorandum
12            v.
                                        Sentencing Hearing:
13  JUAN VAZQUEZ-GONZALEZ,             September 24, 2019, at 9:30 a.m.
      aka "Alonso,"                     Spokane, Washington
14    aka "Adominis goering,"
15                                      Court:
                      Defendant.        Hon. Salvador Mendoza, Jr.
16                                      United States District Judge
17
        Plaintiff United States of America, by and through William D. Hyslop, United
18
   States Attorney for the Eastern District of Washington, and David M. Herzog, Assistant
19
   United States Attorney for the Eastern District of Washington, hereby submits the
20
   following response to the Sentencing Memorandum and exhibits filed by Defendant
21
   Juan Vazquez-Gonzalez ("Defendant"). The United States continues to recommend 120
22
   months in custody, 20 years of supervised release, no fine, a mandatory special
23
   assessment of $100 and a $5,000 special assessment absent a finding of indigence.
24
        Dated: August 27, 2019           William D. Hyslop
25                                        United States Attorney
26
                                          s/ David M. Herzog
27                                        David M. Herzog
28                                        Assistant United States Attorney

United States' Response to Defense Sentencing Position – Vazquez-Gonzalez – page i

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. Introduction

Focusing precious little on his egregious and undisputed conduct, Defendant Juan Vazquez-Gonzalez ("Defendant") seeks a shocking downward variance from the Guidelines: a sentence of *zero* custodial time as a response to conduct for which Congress has designated separate *10- and 15-year* mandatory minimum sentences. The United States submits that Defendant's recommendation is so far from reality – and from the sentences imposed in similar cases – that it offers little meaningful guidance in the task of determining a fair and just sentence in this case. *All* Defendants would prefer to spend zero time in prison, no matter how terrible the things they have done. But a criminal justice system in which a person can get zero custodial time after spending two months courting and pursuing a 13-year-old girl for sex, *and then showing up to meet her in person* to take her back to his apartment, where he has condoms and Playstation games, and plans to engage in a commercial sex act with her while the TV plays loudly so his roommates cannot hear the crime happening, is no criminal justice system at all. It is difficult to take seriously a sentencing recommendation 180 months below the sentence that Congress requires for Defendant's conduct, and 97 months below the low end of the Guidelines range after an incredibly favorable plea agreement. In a feat of sophistry, Defendant claims that "[a] sentence of time served does not denigrate[] the seriousness of this offense" (ECF No. 87, at 35), but that is nonsense; denigrating the seriousness of this offense is *exactly* what a sentence of time served would do.

It appears Defendant is simply trying to create as big a numeric spread as possible between the defense and the United States, in hopes that if the Court comes down somewhere in the middle, the middle is a lower number. That is not how sentencing should work, in this case or any other. To the contrary, the sentencing statute requires the Court to look to Defendant's *conduct* and to avoid unwarranted disparity with similarly-situated Defendants "who have been found guilty of *similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis supplied). As the Court can see from the numerous cases

that the United States has already submitted, ten years is actually on the low side of sentences imposed in this District for online enticement and human trafficking conduct. The United States urges the Court to impose a non-disparate sentence of 120 months, based on the facts and circumstances of the offense and the similar sentences imposed in this District. If the Court is inclined to impose a sentence beneath the United States' recommendation, the United States strongly urges the Court to sentence Defendant within the Guidelines range of 97-121 months – there is no legitimate basis for a variance below that range, and there is certainly no basis for sentencing Defendant to zero custodial time.

By pleading the case creatively, such that the Court retains its discretion to impose a sentence lower than the statutorily-mandated 15-year term for the child sex trafficking conduct in which Defendant *actually engaged*, and then arguing for a Guidelines sentence of 120 months, the United States has already taken into account the mitigation arguments set forth in Defendant's papers. If the United States were taking an aggressive approach, it would have offered Defendant the stark choices of pleading guilty to the 15-year child sex trafficking mandatory minimum or proceeding to trial facing that same term. But the United States has taken a more reasonable and nuanced approach here, based on the personal history and characteristics of the Defendant as laid out in detail by the defense. When the United States has evidentiary leverage and then exercises prosecutorial discretion to resolve the case in a way that takes into account a Defendant's mitigating circumstances, the imposition of a sentence significantly below the United States' already-reduced recommendation disincentivizes the United States from offering similar resolutions in the future. It is one thing to say that fifteen years is too much time for this Defendant in this case, as the United States has said. It is another thing altogether to act as though Defendant simply did not engage in egregious sexual misconduct. Defendant Vazquez-Gonzalez deserves a sentence consistent with the sentences imposed on similarly-situated Defendants — perhaps not fifteen years, but certainly ten.

It may be impolitic to state in writing what the defense and the United States both know to be true, but the practical reality is that every plea offer informs future plea offers, and every sentence informs future sentences. This is a child exploitation and human trafficking case in which the Defendant sought penetrative vaginal intercourse with a 13-year-old girl and showed up in person to go through with it. If, in a case like this, the defense can convince the Court to depart below the Guidelines to a level that is inconsistent with the United States' duties to obtain sentences that provide just desserts, protect the community, deter, and avoid unwarranted disparity, the United States will be disincentivized from offering future pleas that are so far beneath the mandatory minima.

A Guidelines sentence is appropriate and nothing in the defense sentencing papers changes that analysis. Every Defendant has made bad choices; that is why they are in federal court in the first place. Defendant is hardly unique, except that his "bad choice" lasted for two months, included re-initiating with an undercover not once but twice, and was consummated by his willingness to show up in person and engage in penetrative sexual intercourse with a child in exchange for Playstation games.

## II. The United States' Resolution Of This Case Has Already Incorporated Defendant's Relevant Mitigation

Defendant's sentencing arguments come as no surprise to the United States; indeed, all of this information is the basis for the United States offering the incredibly favorable resolution it did here. For that reason, the United States recommends that the Court impose a Guidelines sentence of 120 months; if the Court sees fit to impose a sentence below 120 months despite the sentencing disparity it would create, the United States urges the Court to impose a Guidelines sentence no lower than 97 months, the low end of the Guidelines. Defendant's mitigation arguments are unsupported in fact and law.

### A. Defendant's Upbringing Is Not Significantly Mitigating

Part of Defendant argument is that because he "comes from a good family," had a stable, loving, and law-abiding upbringing, and now enjoys significant familial support,

he should receive no custodial time. (ECF No. 87, at 3-6, 28-30.) These are specious arguments: unlike so many Defendants who grew up without a meaningful opportunity to avoid the criminal justice system, Defendant here had an "awesome" childhood, parents who taught him right from wrong, and an upbringing far from a community in which criminal conduct was the norm or pre-ordained. Indeed, Defendant had every opportunity to lead a law-abiding life, but he *still* sought out sexual gratification from a child. If anything, his solid upbringing is *aggravating*. When a person grows up in a community in which crack cocaine is the true currency on the street, strong parental guidance is missing, and going to prison is seen as simply the cost of doing business, it is understandable when that person ends up dealing crack. Most courts rightly take into consideration that person's upbringing and circumstances in imposing lower sentences for the conduct. But when a person like Defendant comes from a "traditional, middle-class family. And it is through this lens that [he] viewed the world" (ECF No. 87, at 4), and he *still* cannot keep himself from pursuing a child sexually, the only reasonable conclusion is that his sexual interest in children is stronger than the lessons of his upbringing and the opportunities he was given.

Likewise, the defense goes into some detail about Defendant's harrowing illegal entry into the United States and eventual marriage to a United States citizen, which resulted in his obtaining legal permanent residency. One would think that a person who had to survive that ordeal and live in the shadows for years would do everything he could to ensure that he could continue to live in the light. But unlike so many immigrants – those with and without legal status – who genuinely treasure the chance to make a new life in the United States and are loathe to jeopardize it under any circumstance, Defendant spent his freedom, time, and energy preying on a child. There is only one plausible explanation for what could cause someone to squander his hard-won chance: a desire for something else that is stronger than the desire to ensure his own continued presence in the United States. Here, there is no real question about what particular desire drove Defendant: his sexual interest in minor girls.

**B.    Depression And Marital Discord Do Not Justify Defendant's Conduct**

One central thrust of the defense's sentencing position is that Defendant was lonely after his separation from his wife . . . so he sought out sex with a child.  This position is as nonsensical as it is outrageous.  People get depressed all the time without turning to sexual exploitation of children; Defendant is obviously wired differently.  What is troubling and inconsistent about the defense's argument is that depression is a normal human emotional state, and Defendant is certainly going to feel depression again in his life.  If it was depression that caused him to seek out sex with a child – rather than his underlying sexual interest in children – it is difficult to see how any future bouts with depression will end any differently, particularly without the deterrent effect of a significant custodial sentence.

Likewise, the defense rehearses at length the complicated relationship between Defendant and his wife, and the United States wishes them well as they navigate their new normal.  But they too, are inevitably going to find themselves in conflict in the future.  When they do, Defendant is presumably still going to have "an exceptionally strong need to be accepted by others."  (ECF No. 87 at 12.)  The Court must impose a sentence so unpalatable to Defendant that when he finds himself in such struggles, he thinks "despite being depressed and feeling unloved, I will not seek out social or sexual gratification from a child; the last time I did, I went to federal prison for a long time."

**C.    Defendant Can Be A Good Father And Still Be Sentenced Fairly**

Setting aside the cognitive dissonance attendant to the position that a person who has actively preyed on children should receive no custodial time because he is *protective* of children, the United States submits that being a good parent cannot be a get-out-of-jail-free card.  The Court routinely sentences parents to significant time in prison, based on their criminal conduct.  Suffice to say, Defendant is not just a parent *now* – he was a parent of the same three children when he was seeking out "J"'s child for sex in 2017.  It borders on the disingenuous to argue at the time of sentencing that *the Court* should take into account Defendant's loss of parenting, when at the time of his conduct, *Defendant*

*himself* did not consider this potential risk. (ECF No. 87 at 34-35 ("[i]f incarcerated, he will be unable to see his son throughout his incarceration, and continuing beyond his release and deportation to Mexico.".) The risk of incarceration and all of its concomitant losses – liberty, consortium, parenting, and many others – were equally in place from August to October 2017.

Defendant was a parent when he was engaging in criminal conduct, yet he still engaged in egregious criminal conduct *against a child*. Defendants make this argument in many kinds of cases, but it rings particularly hollow in a child exploitation case. It is one thing for a drug or gun Defendant to seek a lower sentence based on his or her loss of time and ability to parent. But part of parenting is the basic requirement of protecting children from people who want to hurt them. When the Defendant is the person from whom children need protection, the argument loses resonance.

The United States has no basis to challenge the many people who describe Defendant as a good father to his own children. But this Court must consider *all* the children, not just Defendant's. The 13-year-old girls in Eastern Washington and elsewhere – whom Defendant has demonstrated a sexual interest in – have the right to live their lives free of the risk presented by Defendant.

### D. Two Months Of Consistently And Affirmatively Seeking Out Sex With A Child Is Not A Single Act Of Aberrant Behavior

It is critical to Defendant's fundamental mischaracterization of this case to maintain the position that he engaged in a single aberrant act. But this argument, whether made by Defendant, his lawyer, or his family and friends, is factually and legally wrong.

First, it is pure legerdemain to argue that a two-month long course of repeated conduct is a single act. By that standard, a years-long drug conspiracy is a single act; a 30-bank robbery spree is a single act; 60 gun sales by a felon on consecutive days is a single act. Defendant could have disengaged after his single act of responding to the UC ad on Craigslist, *by ceasing all communications*. But that is not what happened. In a

post-*Booker* landscape, when courts no longer need to engage in mental gymnastics to explain how a Defendant's conduct is "outside the heartland" of the mandatory Guidelines, Defendant's reliance on *United States v. Takai*, 941 F.2d 738, 742 (9th Cir. 1991) is both puzzling and misplaced. What *Takai* stands for post-*Booker*, if anything, is simply the truism that the Court should "look to the totality of circumstances in determining whether there were single acts of aberrant behavior by the defendants that justify a departure." *Id.* at 743. Here, the totality of the circumstances demonstrate a lengthy, multiple-act course of conduct via hundreds and hundreds of texts and emails over a period of two months, while Defendant knowledgeably used child exploitation jargon and re-engaged twice after the UC withdrew from the interaction. It is just not accurate to characterize Defendant as engaging in a single criminal act of aberrant behavior.

Second, even if it were aberrant behavior, it is difficult to see how that matters. It should not be a meaningful basis for a below-Guidelines sentence (much less a sentence of zero time), when the cost to the child victims of enticement and trafficking is so high. One murder warrants a high sentence; one rape warrants a high sentence; one drug deal of significant quantity warrants a high sentence. The evidence here is clear that Defendant would have raped a 13-year-old girl if she had been real; that conduct is sufficient to warrant a ten-year sentence even if it stands alone.

Third, the United States agrees that there did exist a possibility that Defendant could engage in a single act of aberrant behavior. But he did not actually do that. After initially responding to the UC's Craigslist ad (allegedly an act of aberrant behavior), Defendant could have realized what he was doing, thought to himself "This is insane. I'm trying to meet a child for sex. What am I doing?" and withdrawn from all communications with the UC. But that is not what he did: he continued to chat for two more months, and tellingly, *Defendant re-initiated when the UC went silent.* Defendant swam back to the hook after the UC cut bait on two separate occasions; that is not a single act of aberrant conduct.

Finally, Defendant's reliance on a polygraph examination is misguided. Polygraph examinations are inadmissible for very good reasons, as this Court well knows. It appears clear that Defendant did know exactly how he was supposed to answer in this context, because his answers to the polygrapher are truthful only if one views them with blinders on and caveats exempted. Defendant denied chatting with anyone he knew was under the age of 18 – yet he chatted repeatedly with "K," *who he knew was 13*. (ECF No. 87, Exh. B. at 57). He denied that he engaged in sexual activities while talking with another person in a chat room or messaging – *yet he sent a message to "J" telling "J" that he was masturbating to images of "littles" at that moment*. (*Id.*) He denied homosexual behavior – *yet he went to the apartment of another adult man who he had met on Craigslist, and he went there to engage in mutual oral sex* (he just could not go through with it). (*Id.*) It is difficult to give the polygraph examination – or Defendant's answers during it – significant credence.

But even if Defendant's answers to the two ultimate questions in the polygraph were accurate and truthful, their relevance is dubious, because Defendant could have given the same truthful answers on the day before he was arrested, and still shown up to meet the UC. The only thing that prevented Defendant from having sex with a child was the fact that "K" was an undercover officer and not a 13-year-old. The Court should reject the defense's argument that because he truthfully said he had never touched a child, he would not have done so in October 2017 if one had been there.

A polygraph is by definition retrospective, not prospective. There is nothing about Defendant's "truthful" answer that he had not "had sexual contact" with anyone under 18 that provides meaningful assurances that he never will. Human beings are complicated and, as Defendant proves, respond to opportunities in varied ways. If past bad conduct is not a fair indicator of future bad conduct – as Defendants routinely argue in Rule 404(b) motions – then past good conduct is likewise not a fair indicator of future good conduct. People engage in original criminal conduct all the time; otherwise there would be no such thing as a first-time offender. Here, the results of Defendant's

polygraph can be accurate, and he can *still* be a danger because he is the same person who showed up to meet "K" for sex no matter how he answered on the polygraph.

### E. Defendant's Comparisons To Other Defendants And Other Crimes Are Inapposite

In an effort to distract the Court from the facts of the case, Defendant presents a number of false comparisons. None of them warrant a below-Guidelines sentence, much less a sentence of zero time.

#### 1. *Henry* Is A Different Case With Different Facts, But Defendant's Conduct Is No Less Egregious Because He Used "Nice" Language While He Was Grooming The Child

Defendant emphasizes *United States v. Henry*, CR No. 17-00200-RMP, another case that was taken down on the same date by the Internet Crimes Against Children ("ICAC") Task Force, but the comparison proves both too much and too little.

First, it is outrageous to argue that Defendant "was kind and respectful, wanting a relationship with benefits" (ECF No. 87 at 17) with the 13-year-old girl *he* was trying to rape, unlike Defendant Henry, whose language was more sexually explicit with the 13-year-old girl *he* was trying to rape. It does not matter whether Defendant was "more considerate" or whether his sexually predatory grooming language was "kinder" than Defendant Henry's. Defendant wanted sex with a child, he showed up to get it, and unlike Defendant Henry, he was prepared to pay for it with a thing of value (Playstation games). Defendant was charged with child sex trafficking *because* he was seeking to commodify the child. He was not looking for some kind of love match, whatever that could possibly mean between an adult man and a 13-year-old girl. Defendant notes that unlike Defendant Henry, he did not bring condoms with him. But he did not need to: as he told the UC at the coffee shop, he had condoms and Playstation games at his apartment, where he planned to have sex with "K" with the TV volume turned up so his roommates would not hear them.

It is astonishing that Defendant is actually arguing that his conduct was less severe because, according to Defendant, "it is clear he is more interested in spending time with

["K"] and getting to know [her] before engaging in any sexual act." (ECF No. 87, at 18.). The defense position would be laughable were it not so offensive: the United States has submitted both a summary and the entire corpus of the communications so the Court can see that what Defendant characterizes as his "respectful and frankly considerate" communications, "wanting to get to know" the child. They consisted of nothing more than grooming her so he could engage in sexual acts with her. (ECF Nos. 92, 100, 101.) Defendant's communications had exactly one purpose: sex with "K." He did not ask her anything meaningful about her family, or her interests, or her favorite classes in school, or her friends – which, according to Defendant, would have somehow made his conduct more palatable. All of their banter was sex-related, as one would expect from *a 13-year-old girl whom Defendant had just met on the Internet.* But even accepting as true Defendant's ludicrous premise – that "nice" sexual predation of children is less egregious than "mean" sexual predation – Defendant was not being nice, he was grooming the child. Establishing rapport with a child is arguably a more damaging psychological ploy than Defendant Henry's straight-up sexual overtures.

More importantly, Defendant has lost the forest for the trees: he is making this argument *about an adult man seeking to have sex with a child.* Does it really matter whether he is nice and kind in his banter with a 13-year-old girl, and then rapes her, or whether he is aggressive and mean in his banter, and then rapes her? Does it really matter whether the Defendant sent clothed or naked images of himself to the 13-year-old girl while grooming her? Does it really matter whether the Defendant requested clothed or naked pictures of the 13-year-old girl while grooming her? The United States submits that it does not. The Court should reject these false comparisons.

In terms of sentencing disparity, *Henry* is also a puzzling case for the defense to cite. Defendant Henry's conduct was less severe and gave rise to different charges; he never faced a 15-year mandatory minimum sentence because unlike Defendant Vazquez-Gonzalez, he did not attempt to engage in a commercial sex act. The baseline for Defendant Henry's sentence was *much* lower than for Defendant Vazquez-Gonzalez: 46-

57 months rather than 97-121 months.  (*Henry* ECF No. 49, at 4.)  In *Henry*, the United States argued for an *above-Guidelines* sentence of 70 months (*id.*) and the Defendant was sentenced to an *above-Guidelines* sentence of 60 months.  The *Henry* equivalent here would be for the United States to argue for an above-Guidelines sentence of 135 months, which the United States is not doing.

In fact, despite the fact that Defendants Henry and Vazquez-Gonzalez were each offered plea agreements beneath their most serious mandatory minima (15 years for Defendant Vazquez-Gonzalez, 10 for Defendant Henry), Defendant Henry was sentenced to 60 months after the United States recommended 70 months.  If the sentence in *Henry* were proportionally equivalent here (85% of the United States' recommended sentence), Defendant Vazquez-Gonzalez would be sentenced to 102 months (85% of the United States' recommended sentence of 120 months).  Although unwarranted sentencing disparity should not be based on proportionate numerical calculations, Defendant Vazquez-Gonzalez should receive a sentence between 97 and 121 months *by any measure* – and given his conduct, the United States submits that the appropriate number is 120 months.

### 2. Statutory Rape Is No Better

Likewise, Defendant's attempt to favorably compare his conduct to statutory rape is misguided.  Defendant tries to separate his "intent to establish a personal and sexual relationship with a 13-year-old girl" from "the typical defendant charged with traveling with the intent to engage in illicit sexual conduct under § 2423(b), [who] wants to remain a stranger, have sex with a child and return home."  (ECF No. 87 at 22.)  But look at Defendant's actual texts with the child (ECF No. 92 at 13-17): he talks about the size of his penis, the sexual acts in which they will and will not engage, how he will teach her, how pretty she is, and how she will not get pregnant.  *Id.*  Defendant is no hero for telling her he will get to know her before he "only statutorily rapes" her.  Whether a Defendant grooms a child this way in order to have sex, or has sex with her that would separately violate 18 U.S.C. § 2243(a) is beside the point; as the Court well

knows, a Defendant can violate numerous federal statutes in the course of seeking out a single child for sex. Defendant absolutely "regarded the child as an object" – a sexual object for which he was willing to make a commercial sexual transaction for Playstation games. Defendant's conduct constituted sexual abuse *as well as* attempted enticement and attempted child sex trafficking, and he should be sentenced accordingly.

### 3. *Autery* Is An Inapposite Child Pornography Possession Case

From thousands of child pornography cases, Defendant cites a single decade-old case in which the Ninth Circuit affirmed a sentence of probation in a child-pornography case after the United States made no contemporaneous sentencing objection. *United States v. Autery*, 555 F.3d 864, 868 (9th Cir. 2009) ("The government . . . specifically . . . did not object to the sentence or its method of determination."). Child exploitation Defendants routinely cite *Autery* for the proposition that they should receive probation, but every Defendant is not merely a child pornography possessor, and every case is not *Autery*. It is comparing apples and oranges to conflate the possession and receipt of child pornography in *Autery* with Defendant's months-long interactions with two different individuals while seeking hands-on, penetrative vaginal sexual intercourse with a 13-year-old child, and then showing up in person to consummate the plan. *Autery* is an outlier; it is extremely unlikely that Defendant Autery himself would have been offered a plea agreement in this District to something less than 60 months on child pornography receipt and possession charges. *Autery*, 555 F.3d at 867 ("Autery was indicted in September 2006 on two counts of attempted receipt of child pornography, one count of possession of child pornography, and a forfeiture allegation."). The *Autery* panel itself was not unanimous; as Judge Tashima articulated in the dissent, it actually constituted an abuse of discretion to impose probation for a run-of-the-mill child pornography possessor whose Guidelines range was 41-51 months. *Autery*, 555 F.3d at 880 (Tashima, J., dissenting). *Autery* provides precious little guidance here, where the facts are so dissimilar, Defendant's conduct was so much worse, and his Guidelines are so much higher.

### F. The Context In Which Defendant's Character Witnesses Have Made Their Testimonials Undermines Their Weight and Credibility

As is commonplace, Defendant puts forth a variety of witnesses to vouch for his character. Surely this is helpful on some level; each of these witnesses knows Defendant better than the Court, the prosecutor, or his lawyer. But the Court should consider their statements in light of several limiting factors that diminish their weight.

First, the asymmetry in an online enticement case is profound; in a case with a bona fide child victim, testimonials by Defendant's family and friends can be balanced by impact statements of the victims. Here, where a law enforcement officer was Defendant's victim in lieu of a bona fide child, the United States and the community must rely on the Court to come to the common-sense, evidence-based conclusion that the only thing that prevented Defendant from raping a child that day was the simple fact that, thankfully, "K" was an undercover officer and not a child. What that means at sentencing is that the statements from Defendant's family and friends – made in good faith, certainly – must be tempered by the realization that there can be no competing victim statement in an undercover operation.

Second, it cannot help but ring hollow when a Defendant trumpets his strong social and family network at sentencing, *after* he really needed the kinds of personal relationships that would have kept him from engaging in this conduct in the first place. It is not too stark a question to ask: where were all these people in August, September, and October 2017 when Defendant was allegedly so depressed that he turned to child sex on the Internet for comfort? In particular, Defendant's complicated relationship with his wife falls into this category: not only was she not supportive of Defendant when he really needed her, her "emotional abuse" of him was allegedly part of what caused him to commit this crime. (ECF No. 87, at 8-9.) But now that they are back together, the defense asks this Court to rely on her and their newly-strengthened relationship as evidence that he is back on the right track. (ECF No. 87, at 10-11.) It is difficult to reconcile the cognitive dissonance between the two positions. What happens the next

time they separate or he gets depressed or he and his wife separate?  Lots of people get depressed and lots of people separate from their spouses without ever responding to a Craigslist ad for sex with a child.

Finally, the Court should have some questions about whether Defendant has been truthful with his family and friends about what happened here, which should impact the value of their statements to the Court.  Defendant's mother-in-law, Carol Schmauder, apparently believes that "[w]hen he went to meet the supposed father of the girl it was to tell him to back off and leave him alone."  (ECF No. 87-1, at 60.)  That is absolutely false; if that were truly Defendant's intention, he could have told the UC to leave him alone during any of the hundreds of messages they exchanged, rather than show up in person.  Likewise, Ms. Schmauder appears to be clinging to the fact that Defendant had no money with him when he showed up, *see id.*, as though that is an indication that he did not *really* mean to meet a child for sex.  But Defendant specifically acknowledged the opposite of each of these beliefs in his plea agreement: he affirmatively admitted that he went to the coffee shop for the express purpose of having sex with "K," and his payment would be Playstation games rather than money:

> At an arranged time on October 18, 2017, Defendant traveled to meet "J." at a Starbucks coffee shop near Gonzaga University, and showed up in person to meet "J."  Defendant did not have condoms or Playstation games with him, but he told "J." that "K." could come back to Defendant's apartment where he had condoms and "K." could choose from his Playstation games. Defendant also told "J." that he could turn the volume up on the television in his room to ensure that his roommates would not hear him having sex with "K."  Finally, Defendant recited "the rules," back to "J," including that Defendant would not get "K." pregnant and he would not engage in anal sex with her.
>
> **Defendant acknowledges that showing up to meet "J." at the arranged location and time, for the purpose of engaging in sex with "K." was a substantial step in furtherance of his attempt to entice "K." to engage in illegal sexual activity, and that giving "K." Playstation video games in exchange for engaging in sexual activity with her would constitute a commercial sex act in violation of federal law.  Defendant acknowledges that he travelled in interstate commerce for the dominant**

**purpose of engaging in commercial sex with "K.," a person he believed to be 13 years old.**

(ECF No. 68, ¶ 6 (emphasis supplied).)

Defendant's mother-in-law appears not to have been given that information before addressing this Court. That is not her fault; Defendant put her in an impossible position. How could she vouch for someone who knowingly showed up to rape a child? At the same time, to the extent that her statement is based on a counterfactual narrative, it is difficult to give it any credence.

Likewise, it is hard to see how the Court can ascribe a great deal of weight or credibility to Defendant's other character witnesses, when their knowledge base is so limited. His friend Ms. Jessica Bieber says that "he just was at the wrong place at the wrong time. I know in my heart that what he is currently in trouble for is not something that he would ever intentionally set out to do." (ECF No. 98-1, at 67.) His months of intentional text messages and specific agreement to meet at that coffee shop would seem to undermine her position. Ms. Sarah Anderson tells the Court "I can honestly say that I would trust my life and my kids' lives in his hands." (ECF No. 98-1, at 67.) One wonders whether her position would be the same if it were *her* six-year-old daughter who had turned thirteen and was communicating with an adult stranger online who wanted to meet her in person for sex – so long as it was not anal sex and she did not get pregnant. Ms. Holly Bieber, another family friend, leads off her letter with "I'd like to start off saying 'I do not believe what he is being accused of.'" (ECF No. 87-1, at 62.)

But Defendant is not an innocent man, wrongly accused. He has pleaded guilty. It is one thing to say "I love this person and can acknowledge what he has done; please have mercy on him," and another to inject false assertions of factual innocence into sentencing proceedings based on half-truths. As with Ms. Schmauder, Ms. Anderson, and Ms. Jessica Bieber, one wonders whether Ms. Holly Bieber's position would or should change if she were to review the actual text and email messages Defendant sent, or if she were to listen to the undercover recording at the coffee shop in which

Defendant says he will take the child back to his apartment for sex. Without the ability to articulate their positions from an accurate knowledge base, the credibility of these witnesses is significantly diminished.

What does appear to be consistent is that Defendant's family and friends care about him deeply, and they believe he is generally a good person. The United States has no qualms with those positions. But they do not change the fact that good people make bad decisions all the time, and this good person's bad decision was catastrophically dangerous to the children in this community. No Defendant – no person – is all good or all bad; if the Court's only job at sentencing were to impose punishment on Pol Pot or Stalin, sentencing would be an easy task. But it is not, because the Court has to acknowledge Defendant's personal history and characteristics, and balance them with the nature and circumstances of his offense. Every day this Court sentences people who have many redeeming qualities to significant custodial sentences based on their criminal conduct. Defendant should fare no differently.

### G. The Psychosexual Evaluation Is Of Limited Value

Human beings are complex creatures, and neither Dr. Lisota nor anyone else can predict with any meaningful certainty whether Defendant will recidivate. If the Court were actually able to predict who is going to offend or reoffend against children, we could presumably convert that information into a useful means of preventing child exploitation. Obviously, that is not possible.

Defendant attempts to put a percentage-based prediction on his risk of recidivism: "there is an 87% chance that Mr. Vazquez is not going to reoffend." (ECF No. 87, at 24.) But this figure is deeply flawed for a number of reasons. First, it is utterly meaningless to say, in a vacuum, that there is an X percent chance of any future human behavior happening. People engage in all kinds of different behaviors depending on the *circumstances and context* they are in. This 87% figure does not take into account Defendant feeling depressed, or fighting with his wife, or feeling unloved, which are factors that Defendant himself wants the Court to value as explanations for his conduct.

Second, this figure is entirely dependent on who it is compared to – "the entire sex offender spectrum" is not a meaningful basis for comparison, because it includes truly monstrous individuals who everyone would agree cannot be released back into the society, which skews the percentage in Defendant's favor.  It is a less meaningful metric to compare Defendant to the sex offender population rather than the general population, because many members of the sex offender population should unquestionably be kept away from society.  The safest of all the man-eating sharks is still a man-eating shark.

Third, even if some of the tests Dr. Lisota conducted were physiological and therefore hard for the subject to manipulate, his fifteen-page, single-spaced report is not based primarily on those tests, but on the way Defendant answered a series of questions over the course of three interviews conducted at the request of defense counsel, who paid for them.  All psychosexual evaluations are fatally undermined by this simple truth: there is no meaningful way to test a Defendant without asking him questions that he knows how to answer to get the result he wants.  That is why Defendant's assertions that this examination – or any psychosexual evaluation – is "the gold standard for determining recidivism" (ECF No. 87, at 25) and "based on testing that is next to impossible to manipulate" (*id.* at 32) is both wrong and impossible to demonstrate.

Finally, the defense is deafeningly silent regarding what percentage of Dr. Lisota's work is conducted at the request of the defense, and how much of it is conducted for the prosecution or the Court.  Testifying a couple of times as an expert witness for the State of North Dakota does not make Dr. Lisota any less of a captive defense witness whose neutrality the Court can reasonably question.[1]  The defense has also failed to provide any meaningful longitudinal tracking analysis of Dr. Lisota's work: how many times has he gotten it wrong, and how many people he concluded were "low-risk" engaged in

---

[1] The United States notes that Dr. Lisota appears to be licensed in Idaho and North Dakota, but not Washington; his temporary ability to practice in Washington appears to have expired more than a year ago, in April 2018.  (ECF No. 87, Exh. A at 54.)

subsequent child exploitation conduct?  Without knowing his predictive success rate, it is impossible for this Court to rely on his no-risk or low-risk conclusions.  It appears there is little consequence for Dr. Lisota coming to Defendant-friendly conclusions – except the horrific consequences to future victims when he gets it wrong.

The United States will give more credence to psychosexual evaluations when they appear in *every* child exploitation case, such that the Court sees "Defendant will almost certainly offend again" conclusions in addition to the now-typical "Defendant presents low or no risk" conclusions.  But that is unlikely to happen, because for some offenders even Dr. Lisota cannot conclude that they are safe.  So the only evaluations that the Court will ever see come to the unsurprising conclusion that the Defendant is low-risk.

Finally, all of these critiques pale next to the simple fact that Dr. Lisota would have come to the same "low-risk" conclusion about Defendant *before he committed this crime* – and Defendant still would have answered that Craigslist ad.  It is Defendant's conduct, not Dr. Lisota, that has provided the Court with the most predictive data.

## H.   House Arrest Is Insufficient To Create Specific And General Deterrence

The United States finds it hard to believe that it has to make this argument in a child exploitation case where Defendant *showed up to rape a child*, but 20 months of home confinement is not sufficient to create a deterrent effect, and the people of this community deserve better.  This is no bankruptcy fraud/false statement case, *compare United States v. Edwards*, 595 F.3d 1104 (9th Cir. 2009), and the defense's attempt to conflate deterrence in a potential hands-on child exploitation case with deterrence in a white collar case is both baffling and inappropriate.  Failure to adequately deter a person who defrauds creditors means someone is going to be out some money somewhere; failure to deter Defendant specifically and people like him generally means children get raped.  Those two things are not equivalent; the need to deter Defendant is much greater.  Defendant's recommendation of time-served – a full 15 years below the sentence that Congress has mandated for his conduct –inappropriately respects the deterrence factor.

# I. Defendant's Arguments About Prison Are Unsupported

Defendant's remaining arguments related to the terms of his incarceration are unsupported. There is no basis to believe that he will be at any greater risk for violence in prison than any other prisoner, and he may take advantage of whatever rehabilitation programming is available to him while he is in custody.

# III. Conclusion

One of the main reasons the defense is seeking a time-served sentence in this case is the fact that no bona fide child was at the coffee shop to meet Defendant. It is impossible to believe that if Defendant had gone through with his plans to rape a thirteen-year-old, he would be asking for time served. But there is no principled sentencing difference between Defendant showing up to rape "K" and showing up to rape a bona fide child. All of the evidence in the case establishes that but for "K" being an undercover officer, Defendant would have gone through with it. The United States suspects that this Court would likely have no trouble imposing *at least* a ten-year sentence if "K" had been a real child—which is what Defendant wanted her to be. Under these circumstances, the United States respectfully continues to submit that the only way to accomplish the statutory goals of sentencing is to sentence Defendant within the Guidelines range of 97-121 months. The United States continues to recommend a sentence of 120 months in custody and 20 years of supervised release.

Dated: August 27, 2019

William D. Hyslop
United States Attorney

*s/ David M. Herzog*
David M. Herzog
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to Defendant's counsel of record using the CM/ECF system.

*s/ David M. Herzog*
David M. Herzog
Assistant United States Attorney